William A. McWaters v. Commissioner. Milton R. Thomason v. Commissioner.
William A. McWaters v. Commissioner
Docket Nos. 19706, 19707.
United States Tax Court
1950 Tax Ct. Memo LEXIS 174; 9 T.C.M. (CCH) 507; T.C.M. (RIA) 50152; June 15, 1950
Claude A. Hope, Esq., 15 William St., New York 5, N. Y., and Mayer W. Aldridge, C.P.A., for the petitioners. Newman A. Townsend, Jr., Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These cases, duly consolidated, involve income tax for the years 1941 and 1943. (The year 1942 is involved because of the applicability of the Current Tax Payment Act of 1943.) Deficiencies were determined, as follows: Docket No.
Petitioner
Taxable Year
Amount
19706
William A. McWaters
1941
$ 963.36
William A. McWaters
1943
13,089.57
19707
Milton R. Thomason
1941
16,451.40
Milton R. Thomason
1943
97,342.47
The issues for our determination are: (1) Was the petitioner's wife, *175 A. Y. Thomason, a partner with him and W. A. McWaters in the contracting business conducted under the name "M. R. Thomason, Contractor," during each of the years 1941, 1942, and 1943? (2) Was the petitioner's brother, J. F. Thomason, a partner with him and W. A. McWaters in the contracting business conducted under the name "M. R. Thomason, Contractor" during the years 1942 and 1943? (3) Were certain amounts paid by "M. R. Thomason, Contractor" in 1941, 1942, and 1943, as "rent" on construction machinery and equipment under alleged lease agreements deductible as ordinary and necessary business expense? (4) Did the respondent properly determine the depreciation allowable on the construction machinery and equipment used by "M. R. Thomason, Contractor" in 1941, 1942, and 1943? Docket No. 19707, Milton R. Thomason, petitioner, involves all four issues while Docket No. 19706, W. A. McWaters, petitioner, involves only issues numbers three and four. In both cases there are certain adjustments made by the respondent which are not in dispute. From evidence both oral and documentary, we make the following Findings of Fact During the years 1941, 1942, and 1943, M. R. (Milton R.) Thomason *176 and W. A. McWaters, petitioners herein, were residents of Montgomery, Alabama, and their respective income tax returns for those years were filed on the cash basis with the collector of internal revenue for the district of Alabama. For the purpose of simplification, the use of the word "petitioner" in the singular will refer to the petitioner, M. R. Thomason. Issues No. 1 and 2 Petitioner and A. Y. Thomason were married in 1925. Petitioner had entered the electrical contracting business prior to 1925. A. Y. Thomason was a graduate of the University of Alabama and had taught school before her marriage. After her marriage, she discontinued teaching school. She and the petitioner are the parents of three children, two boys and a girl; their ages in 1941 were 15, 9 and 5. Petitioner started a small electrical contracting business in Birmingham, Alabama, about 1928. At the time he owned some tools and equipment, which he used in the business. The original capital contribution in the amount of $700, was made by his wife, A. Y. Thomason; $200 of the amount was from savings and $500 was borrowed from her mother. The $500 loan was subsequently repaid in 1929 from profits realized by *177 the business. The business was run under the name of Dixie Electric Construction Co., from the petitioner's home, petitioner doing the outside work and A. Y. Thomason doing the office work. The business was continued in Birmingham until about 1931, when the company obtained an electrical installation job in Montgomery. About this time petitioner and his wife moved to Montgomery, where one room of petitioner's home was set aside and used as an office for the business. Beginning about 1938 the business began to expand, going into the erection of airport beacons and the building of structural steel airport center control towers, which involved the undertaking of contracts at points outside of Montgomery. Some time prior to 1941 the name of the business was changed from Dixie Electric Construction Co. to "M. R. Thomason, Contractor." In the years before 1941 petitioner operated the contracting business as a sole proprietorship, and title to the business assets was carried in his name. The profits realized by the business were reported upon his individual income tax returns. Prior to 1941 returns were not filed on any partnership theory. No returns were filed by A. Y. Thomason. During *178 this period A. Y. Thomason kept the books of account and attended to most of the office work, and in so doing devoted about 35 or 40 hours a week to the business. She had a servant who assisted her in caring for the minor children. A. Y. Thomason could and did make withdrawals from the business at will and charged them to petitioner's account. She used these withdrawals to pay household and living expenses as well as for any other purposes she saw fit. Neither she nor petitioner had a personal bank account. Both could, however, draw checks on the business bank account. From a small beginning petitioner's contracting business prospered and grew larger each year. In 1939, W. A. McWaters (one of the petitioners herein) was employed by the business to supervise some of the construction work. McWaters was an experienced construction man and at first was paid an annual salary. In 1940, however, McWaters invested $1,000 in the business and for that year received a salary of $2,600 plus 10 per cent of the profits. Under this arrangement McWaters was not a partner, but in the beginning of 1941 McWaters invested an additional $2,000 and became a partner to the extent of a 15 per cent interest *179 in future profits and losses of the firm "M. R. Thomason, Contractor." At various times from 1928 through 1936, J. F. Thomason, a younger brother of petitioner, had been employed by the firm; in 1938 or 1939 he was employed as a foreman at a salary of $50 a week. When McWaters became associated with "M. R. Thomason, Contractor" on January 1, 1940, J. F. Thomason was an employee and thereafter worked under the direct supervision of McWaters during the first six months of 1940. About July 1940, J. F. Thomason was sent to Belleville, Illinois, to supervise a small project. On returning to the home office and before leaving on another job at a distant point, he discussed with McWaters the possibility of getting an increase in his income. He asked McWaters to take up the matter with petitioner. McWaters transmitted the request to petitioner. J. F. Thomason did not receive an increase at that time. Thereafter, J. F. Thomason was assigned to jobs in various parts of the country. About May 1941, he was sent to Boseman, Montana, as superintendent, to construct an airport. During the course of performing this contract, J. F. Thomason telephoned McWaters and petitioner that he was dissatisfied *180 with his financial arrangement with the firm and on threats of leaving the job, the petitioner persuaded him to complete the contract on condition that he (J. F. Thomason) be allowed to participate in the profits or be admitted as a partner. For the years prior to 1941, petitioner and his wife prepared the income tax returns upon which the business income was reported. About January 15, 1942, a certified public accountant was employed to prepare the 1941 return. In the accountant's office, the following instrument was prepared: "DATA AS TO PARTNERSHIP AGREEMENT BETWEEN M. R. THOMASON, MRS. A. Y. THOMASON AND W. A. McWATERS. "The above named parties were operating and each actively engaged in the business of construction, excavation, road building, erection of steel structures and kindred projects. They had been associated in the active work of this type of business for approximately the number of years stated as follows: "Mrs. A. Y. Thomason had been keeping the records and performing the office duties, including correspondence, bookkeeping, and preparation of tax returns, since 1928. "W. A. McWaters had been associated with the Senior partner, M. R. Thomason, since 1938 *181 as Superintendent or General Superintendent, with the exception of an interval of about eleven months, during which time he worked for some one else. "It was mutually agreed in a verbal agreement in which all of the parties concurred, that beginning January 1, 1941, the two Junior partners, that is, Mrs. A. Y. Thomason and W. A. McWaters should share in the profits and/or losses of the business conducted under the name of M. R. Thomason, Contractor, as follows: "M. R. Thomason, 70% of net profits and/or losses after allowance of a salary credit or drawing account of $2,600.00 annually; "Mrs. A. Y. Thomason, 15% of the net profits and/or losses after allowance of an annual salary credit or drawing account of $1,800.00; "W. A. McWaters, 15% of the net profits and/or losses after an annual allowance of $2,600.00 salary credit or drawing account. "It was further understood and mutually agreed between the three parties as above named that the interest in the profits and/or losses of the two Junior partners, Mrs. A. Y. Thomason and W. A. McWaters, was based upon their services to the business for which they had not been adequately compensated, and that the interest of the said *182 W. A. McWaters in the business was based also upon the fact that he, at the beginning of 1941 invested the amount of $3,000.00 in the business; and it was also mutually agreed and understood that the interest of Mrs. A. Y. Thomason in the profits and/or losses was based on the fact that she had contributed her services to the building of the business for a number of years and instead of drawing the compensation therefore, had allowed what she had justly earned for these services to be absorbed in the operating capital of the business. "It was further specifically understood that the salaries above provided for each of the partners and the percentages of the profits allocated to each one of them was to begin and became effective January 1, 1941, and for each calendar year thereafter until a mutual agreement between all the parties should alter or discontinue such agreement. "It was further agreed and specifically understood between the parties that the business having been operated under the name of M. R. Thomason in the past and having acquired a good will and trade standing on that account, that it would continue to be operated as such instead of adding the names of the partners *183 or the word 'Company' to the name. "The above is a concise statement as made to Mayer W. Aldridge, Certified Public Accountant, Montgomery, Alabama, on January 15th, 1942, the parties further stating that there had been no written agreement at January 1st, 1941 but that the above was the substance of the verbal agreement between them as at January 1st, 1941. "(Sgd.) Mayer W. Aldridge, "Certified Public Account "We hereby certify that the foregoing is substantially true and correct statement of the partnership agreement between us. "(Sdg.) M. R. Thomason "(Sdg.) W. A. McWaters "(Sdg.) Mrs. A. Y. Thomason" Sometime about the latter part of February or the early part of March 1942, petitioner, McWaters, and J. F. Thomason prepared and signed another instrument which purports to relate to the construction business. This instrument, which was undated, was subsequently signed by A. Y. Thomason, and was entitled "Data to partnership agreement between M. R. Thomason, Mrs. A. Y. Thomason, W. A. McWaters and J. F. Thomason." This instrument recited that the four individuals were actively engaged in a business under the partnership name of "M. R. Thomason, Contractor," and agreed *184 that J. F. Thomason, who had been employed as a superintendent for the company for the past three years, had become a fourth partner in the business January 1, 1942. It also provided that the former partnership agreement was amended to include J. F. Thomason as a fourth partner and that the division of profits and losses beginning January 1, 1942, should be as follows: Percentage
of profits
Annual
and losses
salary
after salaries
M. R. Thomason
$3,600
30
A. Y. Thomason
1,800
21
W. A. McWaters
2,600
30
J. F. Thomason
2,600
19
J. F. Thomason did not invest any capital in the contracting business at the time of his alleged entry to the partnership. During the years 1941, 1942, and 1943, the business continued to use the firm name "M. R. Thomason, Contractor" and until the middle of 1943 used office space in petitioner's home. Thereafter the office was maintained at a location in downtown Montgomery, where the name "M. R. Thomason, Contractor" appeared on the office door. About 98 per cent of the projects in which the business participated were constructed under contracts with the United States Government. These projects were located *185 at various points throughout the United States, and consisted primarily of airport construction. Petitioner personally signed all contracts for the business. The title to all business assets was carried in petitioner's name or the name of "M. R. Thomason, Contractor." Each of the four individuals connected with the contracting business continued to do the same type of work after their alleged entry into the business as partners as they had been doing before, except on a larger scale. Petitioner was head of the business and supervised all of its activities. He selected the projects upon which the business would bid, and did most of the work in preparing and submitting the bids. During the years 1941, 1942, and 1943, the business borrowed money on the personal signature of the petitioner. He would also visit the various projects frequently to check upon the progress of the work and to see if there was unison between the Government engineer and the firm's representative. During the same period McWaters and J. F. Thomason worked in the field at various construction projects. McWaters was designated general superintendent in charge of construction and his responsibility extended in *186 general to all projects. Under his supervision J. F. Thomason was in sole charge from time to time of various single jobs. During the same period A. Y. Thomason attended to the office work in Montgomery. She looked after the bank accounts, checked and paid bills and invoices, purchased spare parts and supplies, did stenographic work and handled the correspondence when petitioner was absent from the office. There were no other persons employed for office work until 1943 when the office was moved to downtown Montgomery. At that time a man was employed for $75 per week to handle some of the office work, and thereafter A. Y. Thomason did not go to the office every day and devoted not more than 60 per cent of her time to the business. From the organization of the business through the taxable years she kept the books of account. She also prepared the social security tax returns. During the taxable years two bank accounts were maintained for the business in Montgomery banks. Petitioner and A. Y. Thomason were authorized to draw checks upon both accounts. McWaters and J. F. Thomason had authority to draw checks upon only one of the bank accounts but drew no checks on that bank account. *187 A. Y. Thomason signed approximately 85 per cent and petitioner signed the remaining checks passing through these accounts. Checks for payroll purposes and for the local purchase of supplies were drawn by the project superintendents on bank accounts opened in the vicinity of the businesses' construction projects. Funds were transferred by A. Y. Thomason from the home office bank accounts to the field project accounts whenever necessary to meet payrolls or other commitments. Before 1941 the books of account maintained by the business consisted principally of a cash journal. [1] Thereafter, the cash journal was continued, but at the suggestion of the accountant, [2] ledger accounts [3] were also set up. Prior to 1941 on the "office account" [1] in the ledger there was a single column headed "MRT" in which withdrawals by petitioner and A. Y. Thomason were entered. In 1941 a column was set up for McWaters and the column for petitioner was continued. At first the petitioner's column for 1941 was headed "MRT," but subsequent to the revenue agent's examination in 1944 the initials "Mrs. MRT &" or "AYT &" were added on all eight pages of "office account" to the heading, in ink plainly different *188 from that in which "MRT" had been written. The office account also bears the addition in different ink of the letters "AY" in many places in the corresponding explanatory column. For the years 1942 and 1943 the cash journal had separate drawing account columns for petitioner, A. Y. Thomason, McWaters and J. F. Thomason. The books of the Bauxite Mining & Refining Co., in which M. R. Thomason had an interest, at which the revenue agent looked at the time he was in M. R. Thomason, Contractor's office, showed a change since his examination, in that to an entry as to "M. R. Thomason and W. A. McWaters $15,000" there had been added since that time "M.R., A.Y., J.F." During the years 1941 to 1943, inclusive, A. Y. Thomason's withdrawals from the contracting business were used for the following purposes: 1941
1942
1943
Cash, Groceries, Clothes
$ 861.39
$ 383.00
$ 1,298.89
Dept. and Furniture Stores
510.22
744.97
1,694.45
Doctors
119.77
55.52
64.00
Bonds
225.00
1,216.00
Federal and State Income Taxes
1,119.20
19,153.45
Miscellaneous
60.36
268.69
1,562.56
Total
$1,776.34
$2,571.38
$24,989.35
*189 Principal items included in miscellaneous for 1943 were, as follows: E. E. Forbes Plano Co.
$ 550.90
Mama - Old Piano
55.00
N. Y. Life Insurance Co.
156.70
Fenner & Beane
424.00
$1,186.60 The principal items included in miscellaneous for each of the three years other than those listed above were for donations, school expense and other ordinary household expenses. For the years 1941, 1942, and 1943, partnership information returns were filed under the caption "M. R. Thomason, Contractor." These returns were prepared by an accountant, and upon them and upon petitioner's individual returns for 1939 and 1940, the gross receipts and net profits of the contracting business were disclosed, as follows: Year
Gross Receipts
Net Income
1939
$ 75,944.45
$ 10,189.03
1940
92,511.33
12,777.68
1941
222,637.49
38,089.43
1942
1,067,767.77
178,815.39
1943
1,217,388.21
117,603.03 The partnership information returns disclosed the following distribution of net profits in 1941, 1942, and 1943: Partnership
Salary
Distribution
1941
M. R. Thomason (70%)
$2,600.00
$21,762.60
A. Y. Thomason (15%)
1,800.00
4,663.42
W. A. McWaters (15%)
2,600.00
4,663.41
1942
M. R. Thomason
2,600.00
50,764.62
A. Y. Thomason
1,800.00
35,535.23
W. A. McWaters
2,600.00
50,764.62
J. F. Thomason
2,600.00
32,150.92
1943
M. R. Thomason (30%)
2,600.00
32,400.91
A. Y. Thomason (21%)
1,800.00
22,680.64
W. A. McWaters (30%)
2,600.00
32,400.91
J. F. Thomason (19%)
2,600.00
20,520.57
*190 For the years 1941 to 1943, inclusive, petitioner, McWaters, and A. Y. Thomason filed separate individual income tax returns upon which they disclosed their respective shares of the business income as allocated on the partnership returns. J. F. Thomason filed similar returns in 1942 and 1943 upon which he disclosed the share of business income allocated to him by the partnership returns. McWaters withdrew from the partnership at the end of 1944, and since his withdrawal the business has allegedly operated as a partnership comprised of the following individuals: M. R. Thomason
42.86 per cent
A. Y. Thomason
30.00 per cent
J. F. Thomason
27.14 per cent
On the books of "M. R. Thomason, Contractor," the capital account of J. F. Thomason shows the following: Withdrawals to
Profits and
to Pay
Other
Salary Credited
Year
Income Taxes
Withdrawals
to Account
1942
$ 40.53
$ 3,691.65
$37,350.92
1943
14,708.21
6,152.62
27,800.01
1944
4,046.85
6,735.18
21,428.78
1945
8,512.32
9,263.38
20,142.17
1946
1,652.80
10,615.08
23,725.59
1947
5,090.77
10,017.55
18,426.39
1948
1,088.64
5,027.04
(7,652.20)
The capital *191 accounts on the books of "M. R. Thomason, Contractor," reveal the following credit balances for petitioner, A. Y. Thomason, McWaters, and J. F. Thomason: M. R.
A. Y.
W. A.
J. F.
Thomason
Thomason
McWaters
Thomason
12-31-41
$14,459.29
$ 4,686.68
12-31-42
36,221.89
39,433.31
$50,029.46
$33,618.74
12-31-43
84,169.99
44,006.93
54,460.16
40,556.85
12-31-44
81,963.94
45,475.78
17,847.61
51,030.56
12-31-45
80,983.79
43,539.83
53,271.91
12-31-46
46,623.88
52,070.68
62,129.62
12-31-47
42,388.34
47,673.09
65,447.69
12-31-48
15,452.62
28,254.85
52,737.80
Respondent, in his notice of deficiency mailed to the petitioner, determined that A. Y. Thomason and J. F. Thomason were not bona fide partners for income tax purposes in the business known as "M. R. Thomason, Contractor," and, after allowing "reasonable salaries" for their services, further determined that petitioner's distributable share of the business income in 1941 was 75 per cent and in 1942 and 1943 was 70 per cent. The "reasonable salaries" allowed A. Y. Thomason and J. F. Thomason were, as follows: A. Y.
J. F.
Year
Thomason
Thomason [4]
1941
$1,800
1942
1,800
$3,732.18
1943
1,800
6,101.61
*192 Issue No. 3 During the years 1941, 1942, and 1943, M. R. Thomason or "M. R. Thomason, Contractor," as lessee, entered into a number of agreements under which construction machinery and equipment was leased. About 95 per cent of the agreements were made with Burford-Toothaker Company, an equipment dealer in Montgomery. The following are the pertinent parts of one of the agreements: "EQUIPMENT LEASE "Burford-Toothaker Tractor Company, herein referred to as lessor, leases to the undersigned lessee for the term approximately 5 months, beginning 8-8-41 194 -, the following equipment: * * *
to be used by lessee at Montgomery, Ala.
"Lessee agrees and obligates itself as follows: "(1) To pay lessor rental at the rate of $1,287.00 per month payable in advance from the date of shipment until the date the equipment is returned to lessor; and all rentals may apply on purchase price of $12,870.00 plus 6% interest figured from date of delivery on all rental payments made and on balance of purchase price. "(2) To pay all transportation charges to the point of delivery and in returning *193 the equipment; "(3) To be responsible for the care, maintenance and repair of said equipment until its safe return to the lessor and to pay for all necessary repairs except those caused by defective parts or workmanship; "(4) To pay for all damage caused by lack of proper lubrication or other neglect of lessee or lessee's employees or other persons using said equipment while in lessee's possession regardless of whether the damage is discovered while in possession of lessee or upon inspection when equipment is returned to lessor; "(5) To indemnify lessor against any loss, liability, damage or expense which it may incur by reason of any claim made by third parties growing out of the operation of said equipment; "(6) To return said equipment to lessor at the end of this lease in as good order as that in which it was received, normal wear and tear excepted; "(7) Not to sublet equipment or assign this lease or any rights hereunder without the written consent of lessor. "Lessor shall not be liable for loss or damage due to accidents which may occur in the operation of said equipment nor shall lessor be liable for delays due to defects in said equipment or its failure to perform *194 or for any delay in the delivery of said equipment or removal or return thereof. "In the event of the failure of lessee to pay any installment of said rent or to perform any of the other obligations herein imposed upon lessee or in event said equipment is in lessor's judgment being abused or neglected or damaged in any way in excess of ordinary or reasonable wear and tear, lessor, its agents, attorneys or other representatives shall have the right upon twenty-four hours notice to enter upon any premises where said equipment may be located and repossess and remove same without refunding any rents paid in advance." * * *
Under some of the leases title to the equipment was to be taken by the lessee, at the end of the period, while under others there was a provision that the option to buy could be exercised at any time during the life of the lease. This method of acquiring equipment was used because it eliminated the necessity of making a 25 per cent down payment on the purchase price, which would have been required in the case of an outright purchase, and permitted the equipment to be returned if circumstances changed so that it was no longer needed. When the option to purchase *195 was exercised during the leasehold period, a conditional sales agreement was usually executed to replace the lease. During the years 1941, 1942, and 1943, "M. R. Thomason, Contractor," before exercising the option to purchase and acquiring title to the leased equipment, made payments under such lease agreement, as follows: 1941
1942
1943
(a) Payments under agreements where option to pur-
chase was exercised before end of leasehold period
$ 4,873.00
$60,340.34
$3,700.00
(b) Payments under agreements where option to pur-
chase was exercised at end of leasehold period
30,353.95
33,679.70
250.00
$35,226.95
$94,020.04
$3,950.00 In all cases where the total payments as "rent" equalled the agreed purchase price, the partnership exercised its option and took title to the equipment. "M. R. Thomason, Contractor" leased some equipment under agreements which did not contain an option to purchase. On the partnership information returns filed by "M. R. Thomason, Contractor" for the years 1941 to 1943, inclusive, the following deductions for equipment rentals were claimed: 1941
1942
1943
Equipment Rentals
$39,029.61
$123,895.03
$73,574.52
*196 In the notice of deficiency mailed to the petitioners, the respondent disallowed that part of the equipment rental deductions which consisted of amounts paid under agreements covering equipment to which title was subsequently acquired by "M. R. Thomason, Contractor" upon exercise of an option to purchase. The amounts disallowed [6] were as follows: 1941
$35,226.95
1942
94,020.04
1943
3,950.00
On its returns for the taxable years, "M. R. Thomason, Contractor" deducted depreciation on its machinery and equipment and the respondent allowed such deductions as follows: Depreciation
Depreciation
Year
Claimed
Allowed
1941
$ 1,799.28
$ 6,814.33
1942
10,863.36
39,051.24
1943
35,845.74
59,487.53
In determining allowable depreciation the respondent capitalized the amounts disallowed as equipment rentals and used a composite rate based upon a five year life for new equipment and a four year life for used equipment. The deductions claimed on the partnership returns were computed by use of a composite *197 rate which embraced a four year life for new equipment and a three year life for used equipment. During the taxable years the machinery and equipment owned by "M. R. Thomason, Contractor" was used, weather permitting, approximately 16 to 18 hours a day for seven days a week. Except for some muck holes encountered on the airport site at Aiken, South Carolina, the firm's equipment and machinery was not employed on any unusual terrain or exposed to any severe weather conditions during 1942 and 1943. Substantially all the firm's work was performed for the Army, Navy, or other Federal agencies, and there was continual pressure for rapid completion of all projects. The normal work week for "M. R. Thomason, Contractor," except under pressure, was 40 to 45 hours. The tax returns of "M. R. Thomason, Contractor" reveal the following information: Cost of Ma-
Equipment
chinary and
Repairs and
Year
Equipment [8]
Maintenance
1941
$ 14,009.63
$ 2,111.56
1942
60,332.21
74,202.35
1943 [7]
130,901.27
73,814.34
*198 The 1944 tax return of "M. R. Thomason, Contractor" showed 26 pieces of equipment, including six trucks and one pickup (one piece of the equipment was acquired in 1941, seven pieces acquired in 1942 and eighteen pieces in 1943) sold for $73,130.20, that cost the firm $57,765.23, on which the depreciation claimed to date of sale was $17,479.50. The return indicated six other pieces of equipment were sold for $25,045.56, on which the cost was designated as zero. The return carried the explanation that "These six pieces of Equipment were bought on a 'Rental Purchase Plan' and rental payments equallying the entire amount of cost had been deducted as Rental Expense in prior years." The 1945 tax return showed 13 pieces of equipment (5 pieces acquired in 1942 and 8 pieces acquired in 1943) sold for $53,330.15, that cost the firm $31,448.61, on which depreciation claimed to date of sale was $23,159.66. The average useful life of construction machinery and equipment for depreciation purposes, as recommended by "Bulletin F," a publication of the United States Treasury Department, Bureau of Internal Revenue, is six years. "Bulletin F" explains its position as to construction machinery and *199 equipment, as follows: "Ordinarily, the physical property used by contractors in construction has relatively short lives, due to hard usage and, often, general lack of upkeep during rush jobs. Where a taxpayer maintains complete repair facilities, and equipment is kept in good condition or reconditioned after each job, lives are considerably longer than the average under such circumstances. * * *" Opinion (1) and (2). The first two questions for our determination are whether petitioner's wife, A. Y. Thomason, and his younger brother, J. F. Thomason, either or both of them, were partners with him and McWaters in a business organization known as "M. R. Thomason, Contractor" during the years in question. The petitioner contends that A. Y. Thomason was a member of the partnership for the years 1941, 1942, and 1943, and that J. F. Thomason was a member of the partnership for the years 1942 and 1943. The respondent concedes that the business organization of "M. R. Thomason, Contractor" was a partnership, for he recognizes the petitioner and McWaters as partners. With the fact of partnership established, the respondent's argument that the petitioner dominated the organization or that *200 proper notice was not given that the organization was operating as a partnership is of little weight. After the organization is recognized as a partnership, our question shifts from one of partnership to a consideration of who constitutes the partnership. The respondent contends that even if we should hold that the partnership included A. Y. Thomason in 1942 and 1943, it did not so include here in 1941. We, therefore, first examine the year 1941 in this regard. We note first that prior to 1941 returns were not filed on any partnership theory, although her services were not essentially different before 1941 than they were during or after that year. Therefore, in substance, the contention of the partnership as to her appears based primarily not upon services but upon an agreement which, it is claimed, applies to 1941. The evidence of a partnership agreement as to 1941 is found in the instrument drawn in the accountant's office about January 15, 1942. We have set it forth in full in the facts, partly to bring out the fact that it never states when the alleged agreement "as at January 1st, 1941" was verbally made. The evidence does not otherwise disclose. In short, it appears very pointedly *201 that we are not told when the alleged verbal agreement was made. It might have been made about January 15, 1942, or at any other time previous thereto. The failure to apprise us of the date of the alleged verbal agreement is, in our opinion, very significant. It is even more so when we consider also the fact that the "office account" for 1941 did not, until after a revenue agent had examined it in 1941, indicate that A. Y. Thomason was a partner. On the contrary, only two columns for individuals were carried, one for "MRT" and one for "McW." Some time after the revenue agent's examination in 1944 there was added to the "MRT" either "Mrs. MRT" or "AYT" with, in most cases, the addition of "&" between the initials "AYT" and "MRT." This change is made in all eight pages of the "office account." This changing of the record in an attempt to indicate, contrary thereto, that the wife was a partner in 1941, together with the noticeable omission of any date when the partnership, including her for 1941, was verbally entered into, can not but create a distinctly unfavorable impression. Clearly it reflects upon good faith. The evidence convinces us that the "office account" did not, as to the *202 column for "MRT" bear any indication of his wife in 1941. The fact of change, in the addition in different ink of "AYT" or "Mrs. MRT" to "MRT" appears distinctly on the face of the original record which was placed in evidence, also in the addition in different ink of "A.Y." in many places in the corresponding explanatory column. The revenue agent who examined the record and the column in 1944 testified that to the best of his recollection nothing appeared on the column except "M.R.T." at the time he saw the books; also that books of Bauxite Mining & Refining Co., in which M. R. Thomason had an interest, at which the revenue agent looked at the same time in "M. R. Thomason, Contractor's" office, showed a change since his examination, in that to an entry as to "M. R. Thomason and W. A. McWaters $15,000" there had been added since that time "M.R.', A.Y., J.F." Though A. Y. Thomason, as a witness, denied in one place that there had been any change made in the heading of that column subsequent to 1941, she also stated that the accountant (who as elsewhere appears was not employed until early in 1942) did some of the work in setting up the ledger, and the ledger, with reference to the Mrs. *203 M. R. Thomason account, on its face shows: "Chg'd in Cash book to M.R.T."; and the cash book (the "office account") did show "MRT" as heading on the column carrying the amounts involved, until, as above seen, to "MRT" there was added "Mrs. MRT" or "AYT." Therefore, it clearly appears that her initials did not appear on the above books in 1941. At another point, asked if she set up the ledger upon the advice or at the suggestion of the accountant she answers "I guess 1 did," then adding that she did not remember, it seemed like she had one already. From all of this we have concluded that the revenue agent was correct in stating her initials did not appear when he saw and examined the record in 1944. Our question here, under Commissioner v. Culbertson, 337 U.S. 733, is whether the parties in good faith intended to enter into partnership. As to the year 1941 such good faith has been impugned, in our opinion, on good grounds; and we have concluded that prior to the end of 1941 there was no good faith intent that A. Y. Thomason be a partner. We, therefore, hold as to that year, that there was no bona fide intent that A. Y. Thomason can be a partner with her husband and McWaters. *204 The respondent did not err in ascribing to petitioner as to that year the income claimed to be that of A. Y. Thomason. Having disposed of the partnership question as to petitioner's wife for the year 1941, we now consider whether she was a member of the partnership for the years 1942 and 1943. The facts are clear that A. Y. Thomason signed an instrument about January 15, 1942, which purports to make her a member of the partnership "M. R. Thomson, Contractor." As it seen in our previous discussion, we are not convinced that the instrument establishes a partnership relationship between her, petitioner and McWaters for the year 1941, but we do believe that it establishes a clear intention between the parties that she take part in the business as a partner, from that day forward. We are convinced that A. Y. Thomason, contributed substantial services to the firm and that the firm would have suffered considerable loss without such services. She had complete control of the bank accounts, the heart strings of a business; she wrote 85 per cent of the checks on the home bank account; she could purchase parts and order repairs to equipment and machinery at will, and she could and did withdraw *205 money from the organization at any time she desired. We are aware of the fact that the services performed by her during 1942 and 1943 were substantially no different from services performed in former years; the difference is that she was contributing the services as a partner in 1942 and 1943, while in former years prior to 1941 no partnership returns were filed, from which we only conclude that no partnership was considered existent. It is clear that during these years, 1942 and 1943, she acted and was treated, in all material respects, like a partner. The Supreme Court of the United States stated in Commissioner v. Culbertson, supra, page 742, that: "* * * The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower [327 U.S. 280,] case, but whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their *206 respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" We have considered all the facts in this case and come to the conclusion that A. Y. Thomason, in good faith and acting with a business purpose, intended to join together with the petitioners in the conduct of a partnership during the years 1942 and 1943. We now consider the question in regard to J. F. Thomason, i.e., whether or not the service he performed for "M. R. Thomason, Contractor" were performed as a member or an employee of the partnership. There is no contention that J. F. Thomason contributed any capital to the firm. As heretofore mentioned, he did perform services. He signed an instrument which purports to give him a 19 per cent interest in the firm's net profits and losses after an annual salary of $2,600. "M. R. Thomason, Contractor" maintained two bank accounts in Montgomery (site of the home office). J. F. Thomason was authorized to draw checks on only one of *207 the bank accounts. Even with such authority he drew checks on neither of the accounts. There is no evidence before us to determine what amounts of money were carried in the two bank accounts. Whether one was large and the other small, whether they were about equal, or what the situation was, we have no way of telling. For all we know J. F. Thomason's authority to draw checks on only one bank account may not have carried much weight. It is conceivable that the one bank account may have carried only a small amount of the firm's deposits. Neither do we read in the agreement signed by J. F. Thomason, or the instrument that it purports to amend, any provision for him (J. F. Thomason) to exercise any control over his distributive share of the business. In fact, an examination of the capital accounts demonstrates that he did not exercise any control over his. We have before us testimony by the petitioner, A. Y. Thomason, and J. F. Thomason, that they agreed to leave all profits not required for taxes and living expenses in the business as working capital. The testimony of J. F. Thomason at one place in the record is, as follows: "Q. Did you agree that - did the partners agree they could *208 draw down their participation monthly or quarterly or when? "A. Well, it was agreed that the partners would drawn down as little as was necessary in order to leave the money in the partnership, to have capital so to speak, to work on. "Q. And you did that? "A. I did that." Later in his testimony he modified this language to a certain extent in that he limited the amount of capital to be left in the firm to such capital as was needed to operate the business. He further stated that there was no prohibition against him drawing out his percentage of the capital, but when asked "Was it the understanding that all the partners would leave in approximately the same amount?" he replied "Well, in percentages - I don't know, I just don't remember that that part was discussed." Even in the light of J. F. Thomason's testimony that he could draw out his percentage of the profits of the business, the record does not otherwise disclose that he had the authority to do so. It is quite apparent that the petitioner, A. Y. Thomason, and J. F. Thomason left the bulk of their earnings in the business through the year 1944. After 1944 the capital accounts began to take on an appearance considerably *209 different from the percentages as to distribution of profits and losses. Beginning with the year 1945, the time of McWaters' withdrawal from the partnership, the division of profits and losses of "M. R. Thomason, Contractor" was changed to the following amounts: M. R.
A. Y.
J. F.
Thomason
Thomason
Thomason
42.86 per cent
30 per cent
27.14 per cent A computation based on the firm's books reveals the following percentages of the total capital contributions for the three individuals at the end of the years 1945, 1946, 1947, and 1948: M. R.
A. Y.
J. F.
Thomason
Thomason
Thomason
1945
45.55
24.49
29.96
1946
28.99
32.38
38.63
1947
27.26
30.66
42.08
1948
16.02
29.30
54.68
It appears from the facts that J. F. Thomason's alleged entry into the partnership was based primarily on his services to be rendered in the future for he was not required to, and he, in fact, did not at that time invest any capital in the business, all of which is a complete contrast to the situation existing at the end of 1948. Claiming at that time only a 27.14 per cent interest in the profits and losses of the business, he was furnishing 54.68 *210 per cent of the capital (that amount being $52,737.80); while on the other hand M. R. Thomason, the senior partner, claiming 42.86 per cent of the profits and losses, maintained a capital account at the end of 1948 of only 16.02 per cent of the firm's total capital. It has been established that petitioner and his wife could check on the partnership bank accounts at will. We are not convinced that J. F. Thomason enjoyed the same privilege, and do not believe that he maintained control of his capital account. Under the evidence, J. F. Thomason telephoning from Boseman, Montana, secured a promise that he would either be made a partner or would secure a percentage of the profits. We think the latter is reflected in the facts. There is ample evidence to indicate that he was an employee rather than a member of the partnership. His work was under the supervision of McWaters. There is no indication that he exercised any authority usually attributed to a partner. Based upon all the facts and in the light of consideration held to be appropriate in cases of this character, as heretofore enumerated as contained in the cited portion of Commissioner v. Culbertson, supra, we conclude *211 that petitioner has failed to prove that the services rendered by J. F. Thomason were performed as a member of the partnership. (3) Next, we consider whether certain amounts paid by "M. R. Thomason, Contractor" in 1941, 1942, and 1943, as "rent" on construction machinery and equipment under alleged lease agreements, are deductible as ordinary and necessary business expense. The deductions so claimed were partially disallowed by the respondent in the notices of deficiency mailed to petitioners, as follows: Amount
Amount
Year
claimed
disallowed
1941
$ 39,029.61
$35,226.95
1942
123,895.03
94,020.04
1943
73,574.52
3,950.00 The amounts disallowed represent "rental payments" which the firm made under "lease" agreements covering equipment and machinery to which title was subsequently acquired through application of the rental payments to an agreed purchase price. The record in this case indicates that all the agreements, here under consideration, are similar, and we feel that nothing can be gained in pointing out small differences in the language of the instruments. Neither do the petitioners contend that a different rule should govern where the option *212 to purchase was exercised at the end of the "lease" period or at an earlier date. We see no material difference in the instant case and the facts of Judson Mills, 11 T.C. 25; Helser Machine & Marine Works, Inc., 39 B.T.A. 644; and Hoieproof Hosiery Co., 11 B.T.A. 547. Petitioners on brief state that the above cited cases appear to be adverse to their position, but contend that they are distinguishable and that if they are not distinguishable the entire matter should be reviewed by this Court. It is evident from the facts of the case that under the thought of the Judson Mills case the method here employed had as its ultimate objective the acquisition of title to the machinery and equipment so acquired under the "lease" agreements, or if title was not acquired to create a convenient way to return the equipment in case the circumstances changed so that it was no longer needed. The petitioners claim that the amounts paid constituted rent, but there is no attempt to show that the monthly payments as provided for in the "lease" agreements bore any proximity to the amount that would be required to be paid as rentals on like machinery and equipment *213 secured on the open market, in the absence of any provision to apply the rental payments on the purchase price at some future date. Neither is there any showing, other than the language of the instruments, that the lessee (the petitioners herein) and the lessor considered the payments rent as between themselves. The language of the instruments does not control. Truman Bowen, 12 T.C. 446. There is no evidence that the lessor reported the amounts received from the agreements here in question as rent in its income tax returns. About 95 per cent of the these agreements were made with Burford-Toothaker Company and the vice president-secretary-treasurer of that company was called as a witness by the petitioners but was not asked whether the amounts received through these agreements were returned on the corporation's income tax returns as rent received. If Burford-Toothaker Company had considered these payments as rent and had reported them as rent on their income tax returns, such a fact would logically have been brought into the evidence. We considered in Truman Bowen, supra, the question we have here under consideration, from the lessor's standpoint. A partnership *214 furnished construction equipment to the Government. The value of each item of equipment was agreed upon. Monthly payments called "rents" were made. Title was to pass when the monthly payments equalled value, plus a charge for interest. In case the work was completed before the total purchase price had been paid, the Government could exercise its option to purchase by paying the remainder of the agreed price. We hold there that the monthly payments did not constitute rents under section 22(a) of the Code. Neither do we think that the payer of money under like circumstances would be paying rent as contemplated by section 22(a) of the Internal Revenue Code. On the authority of Judson Mills, supra; Helser Machine & Marine Works, supra, also Chicago Stoker Corporation, 14 T.C. - No. 52 (March 17, 1950), and Holeproof Hosiery Co., supra; we hold that the respondent did not err in disallowing the contested portions of the amounts paid by "M. R. Thomason, Contractor" in 1941, 1942, and 1943, as "rent" on construction machinery and equipment under alleged lease agreements, and such amounts do not constitute deductions as ordinary and necessary *215 business expense. The petitioners do not question the respondent's adjustment in this regard as to capitalizing these amounts as of the date the lease agreements were executed. (4) The fourth question is whether the respondent properly determined the depreciation allowable on the construction machinery and equipment used by "M. R. Thomason, Contractor" in 1941, 1942, and 1943. The depreciation deductions claimed were computed by use of composite rate based upon a four year life for new equipment and a three year life for used equipment. Section 23(i), Internal Revenue Code, allows a deduction for depreciation of a reasonable amount for the exhaustion, wear and tear of property used in a trade or business. "Bulletin F," a publication of the United States Treasury Department, Bureau of Internal Revenue, recommends the use of a six year life in determining allowable depreciation on construction machinery and equipment. As explained in "Bulletin F" the six year recommendation is based on hard usage and often general lack of upkeep during rushed jobs. There is no contention *216 in the record that such a six year life for the average construction machinery and equipment is improper. In the notices of deficiencies the respondent determined allowable depreciation by applying a composite rate derived through use of a five year life for new equipment and a four year life for used equipment. The burden is on the petitioners to prove error in the Commissioner's determination. The petitioners, here, had not established a rate of depreciation in 1941. It is their contention that most of the machinery here involved was acquired in 1941 and 1942, hence, this is the Commissioner's first chance to pass on its accuracy. For this reason the petitioners' argument as to the applicability of Estate of Clarence B. Eaton, 10 T.C. 869, is not sound. There one of the contributing factors in the case was the fact that the partnership's experience over the years demonstrated the accuracy of the method employed. In the instant case petitioners have pointed to no such experience. The petitioners here contend for a composite rate based upon a four year life for the new equipment and a three year life for the used. The fact that they use a composite rate in calculating *217 their depreciation deduction requires more detailed evidence than is produced, to show that the Commissioner erred in his determination, also based upon a composite rate. The use of a composite rate indicates that some of the equipment will last longer than the designated period while other equipment will wear out before the prescribed time. In very general language the petitioners adduced some evidence that most of the equipment the partnership was then using was worn out the latter part of 1943. If such was true, and the firm had purchased such equipment in 1941 and 1942 (as they claim they did), then it appears that they would be contending for at least a three year rate on some and two years on other. In the face of the facts found as to sales of equipment in 1943, 1944 and 1945, as reported on the partnership information tax returns, such as: Year
Selling
Accrued
sold
price
Cost
depreciation
1943
$12,076.30
$ 7,914.71
$ 2,314.39
1944 *
73,130.20
57,765.23
17,479.50
1945
53,330.15
31,448.61
23,159.66
we are not *218 convinced that the machinery and equipment here under consideration was as worn out in 1943 as the petitioners would have us believe by their oral testimony, for machinery used for several years does not ordinarily, if it is then worn out, sell for more than it orginally cost. Another factor weighing against the petitioners is the fact that they expended large sums of money keeping their equipment in repair. We can not believe that they could have spent $74,202.35 for repairs and maintenance on $60,332.31 worth of machinery and equipment, as the partnership did in 1942, according to their tax return, and not have it in fair working condition at the end of the year. We conclude that it has not been shown that the respondent erred in his determination of depreciation allowable on the construction machinery and equipment used by "M. R. Thomason, Contractor" in 1941, 1942 and 1943. Decisions will be entered under Rule 50. Footnotes
1. The use of the terms "cash journal" and "office account" are used interchangeably, and refer to the same set of accounts. ↩
2. The accountant here in question was employed early in 1942. ↩
3. The first page of the ledger account set up for A. Y. Thomason contained the following information: "Mrs. M. R. Thomason (A. Y. Thomason) charg'd in Cash book to M.R.T."↩
4. It is not contended that J. F. Thomason was a member of the alleged partnership in 1941.↩
6. To complete the adjustment these amounts were capitalized by the respondent as of the date the lease agreements were executed.↩
8. Includes automobiles and trucks.↩
7. The return indicated that two pieces of equipment acquired in 1942 and 1943 at a cost basis of $7,914.71 had been sold during the year for $12,076.30. The depreciation claimed on the equipment to date of the sale was $2,314.39. The return also included the sale on November 15, 1943, of two other pieces of machinery acquired April 8, 1942, on a "Rental Purchase Plan," for $18,152.60. The return showed no cost basis and no depreciation claimed. ↩
*. The tax return reported six other pieces of equipment sold for $25,045.56, on which the cost was designated as zero.↩